474 F.Supp. 1306 (1979)
Harry V. JUMP, Superintendent of Insurance, State of Ohio, Conservator of Manchester Insurance and Indemnity Company, an Ohio Corporation, Plaintiff,
v.
Samuel J. GOLDENHERSH, Leo M. Newman, Goldenhersh and Newman, and James B. Hutchings, Defendants.
No. 77-583C (A).
United States District Court, E. D. Missouri, E. D.
August 6, 1979.
*1307 Lewis, Rice, Tucker, Allen & Chubb, J. L. Pierson and Wm. G. Ohlhausen, St. Louis, Mo., Carlile, Patchen, Murphy & Allison, Denis J. Murphy and Alan F. Berliner, Columbus, Ohio, for plaintiff.
Susman, Schermer, Rimmel & Parker, Gerald A. Rimmel, St. Louis, Mo., or defendants.

MEMORANDUM OPINION
HARPER, District Judge.
Plaintiff, Harry V. Jump, Superintendent of Insurance for the State of Ohio, brought this action in his capacity as Conservator of Manchester Insurance and Indemnity Company (hereinafter referred to as MI&I) against defendants, Samuel J. Goldenhersh, Leo Newman, the law firm of Goldenhersh and Newman, and James B. Hutchings, to recover $114,308.83 in legal fees paid to defendants Goldenhersh and Newman, by MI&I shortly before the conservatorship in contravention of the Ohio Revised Code (hereinafter referred to as O.R.C.) § 3903.17.
The plaintiff is a citizen of Ohio and the Conservator of MI&I, an Ohio corporation, the defendants are citizens of Missouri, and the amount in controversy exceeds $10,000.00. This Court has jurisdiction by reason of diversity of citizenship pursuant to 28 U.S.C. § 1332.
The pleadings, credible testimony, stipulations and exhibits disclose that MI&I was an insurance carrier and bank holding company, incorporated and existing under the laws of Ohio, having its principal place of business in St. Louis, Missouri. At the peak of its prosperity it had offices in seventeen states. It owned substantial holdings in two Missouri corporations84.7 percent of the stock of Pioneer Bank & Trust Company *1308 and approximately 24 percent of the stock of Missouri State Bank & Trust Company. It, in turn, was wholly owned by a Missouri corporation, Manchester Life & Casualty Management Corporation (hereinafter referred to as MLC).
The defendant, Samuel J. Goldenhersh, was at all times relevant vice president, general counsel, a director, and a member of the executive committee of MI&I, a director, executive vice president and general counsel of MLC, and one of two general partners in the law firm of Goldenhersh and Newman.
The defendant, Leo M. Newman, was at all times relevant secretary-treasurer, assistant general counsel, a director and a member of the executive committee of MI&I, a director of MLC, and one of two general partners in the law firm of Goldenhersh and Newman.
The defendant, Goldenhersh and Newman, was a law firm and represented MI&I in eastern Missouri at all times relevant, and had its principal place of business in St. Louis, Missouri. The law firm was dissolved in September, 1976.
The defendant, James B. Hutchings, was at all times relevant chairman of the Board of Directors of MI&I. When the case was called for trial the parties to this action by their counsel stipulated to the dismissal of James B. Hutchings as a party defendant.
The remaining individual defendants are being sued not in their capacity as officers and directors of MI&I, but as creditors of MI&I, who knowingly received wrongful payments from the corporation with reasonable cause to believe that their claims were being preferred over those of other creditors of the same class in violation of O.R.C. § 3903.17. The fact that they are principals of MI&I is relevant only for its bearing on whether "reasonable cause to believe" existed.
The sequence of events which culminated in the payment of $114,308.83 in question began in late 1974 and early 1975, when MI&I suffered heavy losses in its casualty business, especially in Florida. As the situation worsened the company phased out its claims offices in Cleveland, Ohio, Miami, Florida, and Kansas City, Missouri.
In the spring of 1975, the Ohio Department of Insurance (hereinafter referred to as Department) began a routine triennial examination of MI&I. The evidence shows that the summer of 1975 was marked by two related occurrences. First, examiners from the Department and company officials were becoming increasingly aware of the financial troubles of MI&I. Second, Goldenhersh was making efforts to update claim files and was instructing lawyers representing the company to settle good claims quickly and defend unsubstantiated claims vigorously so that he could get an accurate picture of the company's liabilities. He was hoping to get an idea of what would be required and available for settlement of cases to determine how much money should be allocated to each case by deducting expenses incurred before settlement from the amount allocated for each claim.
With regard to the financial problems the record revealed that perhaps as early as mid-June, 1975, and certainly by July 1st, officials of the Department held the first of several meetings with Goldenhersh and other MI&I officers to discuss the financial problems of MI&I. At the first meeting, the Department officers stated that preliminary findings indicated that MI&I was under-reserved by at least one million four hundred thousand dollars. At a second meeting shortly thereafter, the possibility of infusing new capital into the corporation to bolster the loss reserves was rejected as unfeasible, and it was generally agreed that it would be wise for the company to stop writing new casualty business and renewals in all states as soon as possible. On July 18th, James Hutchings, president of MI&I, received a letter from Richard Gregg, chief examiner with the Department, instructing MI&I to carry out this decision. On August 4th, Hutchings advised Gregg by letter that he was in the process of canceling all contracts, new business and renewals, that the company was getting out of Florida altogether, that it would close additional offices quickly as the claims review progressed, *1309 and that the company was getting out of the casualty business completely.
That same day Goldenhersh, who was in Florida attending to the abovementioned process of updating company files, sent a memorandum to James Hutchings, discussing both the claims situation in particular and the financial situation in general. He stated that he was visiting adjustors and lawyers representing the company, investigating pending litigation, encouraging prompt settlement of good claims and vigorous defense against bad ones, and that he was thinking of reducing operations in Louisville, Minnesota and Louisiana.
At a meeting on August 5th, attended by Department officials, and by Goldenhersh and other representatives of MI&I, including an accountant, an attorney and several officers and directors, Department officials stated that they now believed that MI&I was under-reserved by more than four million dollars, and recommended that it cancel its management contract with MLC, whereby MLC performed management services for MI&I, in exchange for seven percent of the business of MI&I. They also suggested that MLC guarantee MI&I's liabilities, and that MI&I refrain from transferring any of its assets without departmental approval. The preparation of a news release concerning MI&I's termination of its casualty business and its recent heavy losses was also discussed.
On August 11th the officers and directors of MI&I and MLC met to carry out the Department's suggestions, at which meeting Goldenhersh and Newman were present. Ralph Hutchings, chairman of the MI&I board of directors, summarized the company's financial plight, advised a voluntary cessation of business, and stated that there was a possibility that the Department might take regulatory action, depending on the results of the triennial examination. At his suggestion, the directors passed resolutions that MLC would guarantee MI&I's debts, that the management contract would be terminated, and that company would obtain the consent of the Department before transferring any assets. Goldenhersh successfully moved for a resolution that Ohio counsel be appointed, and that in conjunction with that counsel, company officers be authorized to enter into such agreements with the Department as would best serve the needs of MI&I, and to litigate any issue as to which satisfactory accord could not be reached.
A copy of the MLC guarantee was forwarded to the Department and Hutchings and Mr. Proost, a member of the St. Louis law firm of Peper-Martin, who was representing the company and attending some of the meetings, testified that the Department had promised to let them know on or about August 22nd whether conservatorship and liquidation were considered necessary. Hutchings testified that by early August, Gilmore, deputy director of the Department, expressed concern about the efficacy of the guarantee because MLC appeared to be insolvent. However, the Department did not contact the company on August 22nd, and when Hutchings asked in late August what that meant he was told by Stafford McGuire, an examiner for the Department, to "let sleeping dogs lie."
On August 11, Proost sent a letter to MI&I and attached a copy of a news release marked for immediate release. The news release stated in part that MI&I as of September 1st was discontinuing the writing of casualty business, that there would be no new or renewal casualty business after that date, that in 1974, seventeen million dollars of its twenty-four million dollars of revenues was from casualty business, and that although its banking and life insurance operations were profitable, it had suffered heavy pretax losses in 1974 and the first quarter of 1975 in its casualty business. It was also stated that the company was conducting an in-depth review of its claims portfolio to determine the adequacy of its reserves, and that it had recently added eight hundred thousand dollars to the reserves.
By mid and late August the claims evaluation was accelerating. Defendants' Exhibits C, D, E and F, and letters dated August 18th and August 29th, illustrated the company's *1310 efforts to find out from attorneys how many of the cases MI&I assigned to them were still unresolved and an estimate of the settlement prospects and the expenditures involved in each case.
On August 18th, Goldenhersh, who was in Florida, sent a memorandum, "Re: Dade and Broadway County Claims" (Joint Exhibit 15), indicating that he had visited several firms, as well as adjustors, insurance investigatory associations and postal authorities investigating a high incidence of fraudulent claims in Florida. He stated that he had been inspecting MI&I files to see how many cases were outstanding, and that he planned to ask as many attorneys as possible for an updating of the files, and for interim billings covering all work to date, instead of the usual itemized close-out billing submitted to MI&I at the conclusion of each case. In this manner he hoped to establish a complete expense factor for each file to be used for defense or settlement, with amounts spent deducted from amounts allocated as a means of determining how much money was available for the claimant in each case.
Also on August 18th, Goldenhersh wrote to the law firm of Vernus & Bowling requesting information on MI&I cases, including a list of trial settings, so that the company could give special attention to matters currently on the docket.
On September 3rd, Goldenhersh authored a memorandum stating that Blackwell would work on the claims evaluation program with attorneys and adjustors, including the East St. Louis firm of Goldenhersh and Goldenhersh.
Goldenhersh never carried out the suggestion of systematically asking the lawyers representing MI&I for interim billings. The only two interim bills which MI&I received during this period were voluntarily submitted by the firm of Peterson, McGowan & Feder on August 29th, one case requiring only "closing arrangements", and another so lengthy that the firm did not want to wait until it was over to bill. (Defts' Exhibits E and F).
The record is clear that Fred Kreiner of the firm of Kreiner, Euhlinger & Lewis, who represented the company in the Cleveland area, Lawrence Kuvin of Kuvin, Klingensmith & Lewis, a Florida law firm, Max Foust of Morris, Foust, Beckett, a Kansas City law firm, and the firm of Meyer, Stephens and Rea, were not asked to submit interim bills, even though Goldenhersh was in contact with them in August concerning the status of MI&I cases. Foust, Kuvin and Kreiner all testified that their usual method of billing was to collect their fees as each case closed, sending an itemized bill and cover letter. They had not been sending interim bills.
The claims program, whatever its virtues, was not a panacea for the company's financial problems. By late summer, rumors of its condition had reached Kuvin in Florida and Fred Kreiner in Cleveland. Kuvin asked Goldenhersh if there were any truth to the rumors and Goldenhersh denied them.
The claims program did not accomplish its alleged purpose in expediting payment of settlements and fees. Payments on losses decreased. Before the start of the program, drafts issued to cover losses were in the range of one million one hundred thousand to one million two hundred thousand dollars each month. In June, the company disbursed $845,000.00 for losses; in August, $876,000.00; and in September, $594,000.00. Out of approximately $388,000.00 paid to lawyers and adjustors in September, $114,308.83 was paid to the law firm of Goldenhersh and Newman, and plaintiff alleges that another $140,000.00 of that $388,000.00 represents wrongful and preferential payments to the East St. Louis law firm of Goldenhersh and Goldenhersh, to the Florida firm of Vernus & Bowling, and to James Meyer of Marian, Illinois, all of which plaintiff is trying to collect in other jurisdictions. This leaves only about $133,000.00 in nonpreferential payments to lawyers and adjustors in September.
Against this background of declining financial vigor, concern by the Department, and efforts to update files and to drastically *1311 narrow the scope of MI&I's operations, and at a time when conservatorship was imminent, the payments which form the basis of this lawsuit were made. Between September 5th and September 23rd, 1975, MI&I paid $114,308.83 to the law firm of Goldenhersh and Newman for legal services which the firm rendered to MI&I in the St. Louis area. Plaintiff contends that these payments were preferential and in violation of O.R.C. § 3903.17 because, at a time when conservatorship was imminent, they enabled Goldenhersh and Newman to obtain one hundred percent of the debt owing to them by MI&I, while other creditors received nothing, or received less than one hundred percent of the debts owed to them by MI&I.
These payments were a departure from the past practice in several respects. First, they were interim billings, although the law firm's policy had been in the past to bill when each case was closed. Second, previous bills had been itemized and had included a cover letter, but the September billings were in some instances invoices in Newman's handwiriting, hurriedly submitted, despite the rigors of the very heavy trial docket which he was handling at the time, and the tax disadvantages of receiving the $114,388.83 after having received a very large contingent fee earlier in the year.
A third unusual factor in the payments was that the law firm of Goldenhersh and Newman received much more in September than they had in previous months during 1974 and 1975. The monthly payments had usually been in the range of $15,000.00 until August, 1975, when the firm received $40,000.00, and then took a dramatic leap to the $114,308.83 level in September.
In September an unusually large retainer was paid to Goldenhersh by MI&I (Goldenhersh turned his retainer over to the law firm). He had received $900.00 per month in 1974 and up to August in 1975, when he received $825.00. In September he received $2,625.00 (Plff's Exs. 3, 4 & 5). This $2,625.00 is not involved in this suit, but taken with the evidence about the company's payments to the law firm of Goldenhersh and Newman, their dwindling claims payments, and their failure to pay most other law firms in the same manner, it is indicative of the thinking of Goldenhersh and Newman when the payments totalling $114,308.83 were made. They were anxious to obtain payment while payment was still possible.
While Goldenhersh and Newman were being paid one hundred percent of their fees, most other lawyers were not being paid in a like manner. Max Foust has filed a proof of claim for $150,000.00 (Plff's Ex. 9), which MI&I allegedly owes him for services performed before September 23, 1975. The firms of Meyer, Stephens and Rea, Kreiner & Kuvin and Klingensmith & Lewis also filed proofs of claim (Plff's Exs. 10, 11 & 13, Defts' Ex. H). Kuvin's proof of claim, filed with the Florida Insurance Guarantee Association, seeks to recover $91,353.00 for services rendered before September 23, 1975.
On September 8th, Ralph Hutchings went to Columbus, Ohio, to discuss with the Department the possibility that MI&I might retain its casualty business in the St. Louis area which was still profitable. At that time Richard Gregg, chief examiner of the Department, and Joseph Gilmore, deputy director of the Department, said that they were "going to move on the company" and that they wanted to appoint a conservator and would file suit to obtain the appointment if MI&I did not consent. Hutchings immediately called Goldenhersh to give him the news.
On September 9th over seventy drafts were issued by MI&I to pay the law firm of Goldenhersh and Newman. Payments continued to be made through September 23rd.
On September 22nd, the Board of Directors passed a resolution ratifying the terms which some of the company's officers had negotiated with the Department, and consenting to a conservatorship. Even after consenting to the conservatorship, MI&I paid Goldenhersh and Newman $2,150.00 on September 23rd, the day on which the conservator was appointed.
On September 23, 1975, plaintiff filed a "Complaint for Rehabilitation or Liquidation *1312 and Request for Injunctive Relief", pursuant to O.R.C. § 3903.03 with the Court of Common Pleas of Franklin County, Ohio, praying for an order finding that sufficient cause existed for the rehabilitation or liquidation of MI&I and for an order appointing the plaintiff as conservator and for an order directing the plaintiff as conservator to take possession of the property, business and affairs of MI&I for the purpose of rehabilitation and liquidation of the same.
The same day the Court of Common Pleas of Franklin County, Ohio, issued an order pursuant to O.R.C. §§ 3903.03 and 3903.06 appointing the plaintiff as conservator, finding that sufficient cause existed for rehabilitation or liquidation of MI&I, stating that MI&I had consented to the conservatorship, and enjoining the company from transferring, disposing of or distributing any of its assets or making any preferential payments, and directing plaintiff to take charge of the property, business and affairs of MI&I for the purposes of rehabilitation or liquidation.
On September 26th this order was registered in the Circuit Court of St. Louis County, Missouri, pursuant to the provision of the Missouri Uniform Enforcement of Foreign Judgment Laws § 511.760, R.S.Mo. 1969.
In a similar case the Court of Appeals of Ohio in Morris v. Investment Life Ins. Co., 1 Ohio App.2d 330, 204 N.E.2d 550, 554, said:
"Succinctly put, the statutes contemplate that the superintendent, upon appointment, is to examine the affairs of the company, and then recommend to the court either termination of the proceeding, a rehabilitation plan or liquidation. Notice and a hearing must be given on the recommendation. This hearing and determination is the essential nub and decisive action in the whole proceeding. * * * In our opinion, the determination of that hearing is a final order affecting a substantial right and appealable."
On October 15th, the plaintiff filed a motion to liquidate MI&I in the Common Pleas Court of Franklin County. The court thereafter held a hearing on the motion.
On February 11, 1976, a finding of fact and conclusion of law was entered by the Court of Common Pleas of Franklin County, Ohio, with respect to the motion of the plaintiff for an order of liquidation, and on February 13th, pursuant to said finding of fact, the court entered its order directing that MI&I be declared, adjudicated and decreed to be insolvent, and further ordered that the superintendent of insurance of the State of Ohio be empowered, authorized and directed to liquidate all the property, business and affairs of MI&I in accordance with the laws of the State of Ohio and under the continuing jurisdiction of the court. This order was appealable.
On February 26, 1976, an ancillary receiver was appointed by the Circuit Court of Cole County, Missouri, and was directed by court order to conserve the assets which MI&I had in Missouri to prevent inequitable preferences, and conserve, rehabilitate or liquidate the company with due regard to the rights and powers of the Ohio conservator.
On March 29, 1977, an order of the Common Pleas Court of Franklin County, Ohio, directed plaintiff to collect any preferential payments made within four months of the plaintiff's appointment as conservator.
On July 8, 1977, the Supreme Court of Ohio dismissed an appeal from the Court of Appeals of Franklin County, Ohio, for the reason that no substantial constitutional question existed.
On March 23, 1978, the Court of Appeals of Franklin County, Ohio, affirmed the judgment of the Court of Common Pleas of Franklin County, Ohio of February 13, 1976.
As directed by the order of the Common Pleas Court of Franklin County made on March 29, 1977, the plaintiff brought this action under O.R.C. § 3903.17 seeking to collect alleged preferential payments made within four months of plaintiff's appointment as conservator. The plaintiff is not suing Goldenhersh and Newman as officers or insiders in the company who caused the payments to be made, but as creditors who *1313 accepted the payments with reason to believe that they were being paid while other creditors of the same class were not.
Defendants contend that this Ohio statute cannot be applied by this Court. In a diversity of citizenship case like this one the conflicts of law doctrine of the forum state applies. Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.
Defendants cite a number of cases having to do with contracts and torts where the Missouri law applies. This is not a simple contract, tort, or common law case, but one involving an elaborate and regulatory scheme among the several states which must be delicately balanced. This is not a case arising out of a dispute about the contract for legal services between MI&I and the law firm of Goldenhersh and Newman. It is an attempt to collect preferential payments which MI&I made which are prohibited by O.R.C. § 3903.17. It arose pursuant to the conservator's statutory duty to preserve and liquidate the assets of MI&I and the statutory policy against preference.
Insurance company liquidation cases do not follow the same conflict of laws doctrine which applies to contract and tort cases. According to the Missouri conflicts of law doctrine for insurance cases, the substantive law of the state of incorporation and domicile should be applied, even if most of the events of the case happened in Missouri. Most states have found it wise to follow this doctrine because insurance companies have traditionally been state-regulated, rather than being subject to the Federal Bankruptcy Act (11 U.S.C. § 22), and the state laws form a delicately balanced network designed to protect all creditors of an insurance company equally, regardless of the state of their residence.
The other states in which the company did business have traditionally appointed ancillary receivers to liquidate the assets in that state, subject to the laws of the domiciliary state and the powers of the domiciliary liquidator.
The leading case on the Missouri conflicts doctrine for insurance liquidation cases is McDonald v. Pacific States Life Ins. Co., 344 Mo. 1, 124 S.W.2d 1157. At 1159 the court said:
"[T]he * * * liquidator in this case is more than a mere chancery receiver. He derives his power, not from the court's decree, but from the statute under which the decree was rendered. That statute is a part of the charter of the corporation, carried with it into every state in which it owns property or does business. Under that statute, when the Colorado court found the corporation insolvent and placed it in liquidation, the statutory liquidator became the corporation itself; that is, he succeeded to all its rights and title to its property and can protect such rights and assert such title in the courts of all the states as a matter of right and not merely by comity." (Citing cases.)
The court further said at 1162:
"We believe that a policyholder in an insurance company is bound by the statutory provisions of the state of the company's domicile; that such provisions are a part of the company's charter * * *."
The court further said at 1162-3:
"We believe that the weight of authority is that the assets of insolvent insurance companies should be treated as a unit, and disposed of for the benefit of all creditors ratably without regard to the location of the assets or the residence of creditors. * * * To permit the property of insolvent insurance companies to be subjected to the claims of the most diligent creditors in each of the states where such assets may be located, would result in the dissipation of such assets and the subjection of the same to the claims of the most diligent creditors in preference not only to the creditors of other states, but in preference to the claims of other creditors in the same state.
"We believe that the legislative enactments of Missouri indicate a contrary policy. * * * They provide for the equitable *1314 and ratable distribution of the assets to all the creditors without regard to location of assets or residence of creditors."
While the McDonald case deals with a creditor who had obtained a judgment, the present case does not concern such a judgment, but concerns payments already made to a defendant-creditor while the company was still in operation. This difference in fact is not important because the policy against preferential payments is the same in both situations, and the reason for applying the law of the domiciliary state is the same.
Since June 16, 1976, conservators from other states bringing suit in Missouri have had support from statutes as well as case law for applying the substantive law of the domiciliary state. In 1976, the Missouri legislature enacted the Uniform Insurance Liquidation Act, R.S.Mo. §§ 375.950 to 375.990. Ohio passed the same statute in 1953, O.R.C. §§ 3903.24 to 3903.33. The new statute merely echoes McDonald with its emphasis on deferring to the regulatory power of the domiciliary state so as to provide equal treatment for all creditors, regardless of the location of the assets or the residence of the creditors. While the new statute is not relied upon since it was passed after the facts of this case, it is cited because it reaffirms the Missouri case law as set out in McDonald, supra.
Having determined that Ohio law applies we turn to an examination of the statute which forms the basis of this lawsuit, § 3903.17. Plaintiff's petition is based on the second paragraph of this statute, and that paragraph reads as follows:
"Any transfer of, or lien upon, any property of any company made or created within four months prior to the filing of a petition for an order to show cause under section 3903.03 of the Revised Code, which enables any creditor, policyholder, or contract holder to obtain a greater percentage of his debt that any other creditor, policyholder, or contract holder in the same class and is accepted by a creditor, policyholder, or contract holder having reasonable cause to believe that such a preference will occur, is voidable. Where the preference consists in a transfer, such period of four months does not expire until four months after the date of the recording or registering of the transfer if such recording or registering is required by law."
The purpose of this paragraph of the Act is to insure that in the event a petition to show cause is filed under O.R.C. § 3903.03 one creditor does not receive a greater share than another of the same class. It does not require proof of intent to prefer the creditor, but only requires the creditor to have reasonable cause to believe that a preference will occur.
What was said in McDougal v. Central Union Conference Association, etc., 110 F.2d 939, 941, with respect to reasonable cause to believe is applicable in this case:
"In determining whether a preferred creditor has reasonable cause to believe a preference will be effected, every case must be viewed and interpreted in the light of its own facts, circumstances and surroundings. Joseph Wild & Co. v. Provident Life & Trust Co., 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003. It is not required that the preferred creditor have actual knowledge as to the result of the transaction in creating a preference, nor that he have any actual belief on that question. All that is necessary is that he have reasonable cause to believe that a preference will be created. * * * It will be sufficient if he have such knowledge or notice of such facts and circumstances as would incite a person of reasonable prudence under similar circumstances to make inquiry. And if inquiry would lead to the development of facts essential to the knowledge of the situation, he will be chargeable with knowledge thereof." (Citing cases.)
The four-months requirement of § 3903.17 has been fulfilled. The payments which the plaintiff seeks to recover were made to the law firm of Goldenhersh and Newman between September 5th and 23rd. The conservatorship began on September 23, 1975. *1315 The payments enabled the law firm of Goldenhersh and Newman to obtain a greater percentage of their debt than other creditors in the same class. The evidence discloses that several lawyers and law firms were not paid for the work that they performed during the same period of time that Goldenhersh and Newman had performed their work for which they were paid, and have had to file claims for such with the plaintiff. All lawyers are part of the general class of unsecured creditors.
At the time the payment was accepted by the law firm of Goldenhersh and Newman, the general partners of that firm, Samuel J. Goldenhersh and Leo M. Newman, had reason to believe they were being preferred.
The credible evidence supports the conclusion that Goldenhersh and Newman each knew and/or had reason to believe that other creditors of the same class would not receive one hundred percent of their claims as they had. They both occupied key policymaking roles with MI&I as officers, directors, and executive committee members. Goldenhersh as general counsel was intimately involved in the day-to-day management and affairs of the company. Both men were aware that for several months the company was declining financially and was in a very weak financial position. They knew several of the branch offices had been closed. Both knew that the company was seriously under-reserved, and that there was no hope of obtaining substantial new capital for the depleted reserves; that the company had been forced to stop writing new and renewal business and had to get out of the casualty business; that by virtue of their attendance at the directors meeting on August 11th both knew that the company had been forced to terminate its management contract with MLC; that MI&I had to obtain departmental approval before transferring any of its assets; that departmental approval was not obtained before making the payments in question to the Goldenhersh and Newman law firm; and that MI&I officials had been empowered to engage Ohio counsel and to litigate any issues on which they could not reach an agreement with the Department.
These and other evidence previously referred to clearly illustrate facts that would indicate to both Goldenhersh and Newman that creditors would not get one hundred percent of their claims while they were being paid and that the company liabilities greatly exceeded its assets at the time the payments were made.
Accordingly, the Court finds for the plaintiff on his cause of action against Samuel J. Goldenhersh and Leo M. Newman, the only two general partners of Goldenhersh and Newman, a law firm that has been dissolved, and assesses the plaintiff's recovery in the amount of $114,308.83.
The Court adopts this memorandum opinion as its findings of fact and conclusions of law.